CATHOLIC SOCIAL SERVICES, INC.; American Federation of Labor—Congress of Industrial Organizations; United Farm Workers of America, AFL–CIO; Miguel Galvez Moran; Immigration Program; Esaul Delgadillo–Uribe; Gustavo Rodriguez; Anil K. Urmil; Ismael De La Cruz; Elma Barbosa; Qutb–E–Alam Kahn; Mohammed Haq; Jesus Reyna Reyna, Plaintiffs–Appellees,

v.

IMMIGRATION AND NATURALIZATION SERVICE; Janet Reno, Attorney General; Doris Meissner, Commissioner of Immigration and Naturalization Service, Defendants–Appellants.

Catholic Social Services, Inc.; United Farm Workers of America, AFL–CIO; Esaul Delgadillo–Uribe; Gustavo Rodriguez; Anil K. Urmil; Ismael De La

Cruz; Miguel Galvez Moran; Elma Barbosa; Jesus Reyna Reyna; Qutb–E–Alam Kahn; Mohammed Haq, Plaintiffs–Appellants,

v.

Janet Reno, Attorney General; Doris Meissner, Commissioner of Immigration and Naturalization Service; Immigration And Naturalization Service, Defendants–Appellees.

Nos. 98–16269, 98–16423.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 20, 2000

Filed Nov. 21, 2000

---

Robert M. Bombaugh, M. Jocelyn Wright, Keisha Dawn Bell, Department of Justice, Washington, D.C., for the defendants-appellants-cross-appellees.

Peter A. Schey, Carlos Holguin, Center for Human Rights and Constitutional Law, Los Angeles, California, Michael Rubin, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, for the plaintiffs-appellees-cross-appellants.

Robert B. Jobe, San Francisco, California, for amicus American Immigration Lawyers Association.

Erwin Chemerinsky, University of Southern California, Los Angeles, California, amicus.

Marc Van Der Hout, San Francisco, California, for amicus National Immigration Project, et al.

Before: HUG, Chief Judge, BROWNING, REINHARDT, KOZINSKI, TROTT, FERNANDEZ, T.G. NELSON, HAWKINS, THOMAS, GRABER and W. FLETCHER, Circuit Judges.

Opinion by Judge WILLIAM A. FLETCHER; Dissent by Judge KOZINSKI; Dissent by Judge FERNANDEZ; Partial Concurrence and Partial Dissent by Judge GRABER.

WILLIAM A. FLETCHER, Circuit Judge:

Plaintiffs bring a class action challenging the advance parole policy of the Immigration and Naturalization Service ("INS") as inconsistent with the Immigration Reform and Control Act of 1986 ("IRCA"), and challenging § 377 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") as inconsistent with the equal protection component of the Due Process Clause of the Fifth Amendment. We must decide whether, under *American Pipe Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), and *Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the statute of limitations was tolled during the pendency of an earlier class action, and whether plaintiffs may bring a class action in this case. If we decide that this suit may go forward as a class action, we must further decide whether the district court acted appropriately in granting in part, and denying in part, preliminary injunctive relief to plaintiffs.

For the reasons that follow, we hold that the statute of limitations was tolled and that this case may proceed as a class action. We further hold that the district court acted within its discretion in granting a preliminary injunction protecting members of the class challenging the INS' advance parole policy as inconsistent with IRCA. Finally, we hold that the district court erred in concluding that the earlier class action prevented it from granting preliminary injunctive relief to members of the class challenging § 377 of IIRIRA as inconsistent with equal protection. We therefore affirm in part and reverse in part the decision of the district court, and we remand to the district court for further proceedings.

I

This litigation has a long and unhappy history. In passing IRCA in 1986, Congress created a one-time legalization program for illegal aliens who had resided in this country continuously and unlawfully since 1982. *See* Pub.L. 99–603, 100 Stat. 3359, *codified at* 8 U.S.C. § 1255a. The House Report accompanying IRCA stated, "The Committee intends that the legalization program should be implemented in a

liberal and generous fashion.... Such implementation is necessary to insure the true resolution of the program and to insure that the program will be a one-time-only program." H.R.Rep. No. 682(I) at 72, *reprinted in* 1986 U.S.C.C.A.N. at 5676. IRCA provided for a twelve-month period during which eligible aliens could file legalization applications with the INS. The Attorney General subsequently established this period as the twelve months between May 5, 1987 and May 5, 1988. *See* 8 C.F.R. § 245a.2(a)(1).

To be eligible for legalization under IRCA, illegal aliens must have resided in the United States since January 1, 1982, and must have been continuously physically present in the United States except for "brief, casual, and innocent absences," since November 6, 1986. The relevant text provides:

Continuous physical presence since November 6, 1986

(A) In general

The alien must establish that the alien has been continuously physically present in the United States since November 6, 1986.

(B) Treatment of brief, casual, and innocent absences

An alien shall not be considered to have failed to maintain continuous physical presence in the United States for purposes of subparagraph (A) by virtue of brief, casual, and innocent absences from the United States.

8 U.S.C. § 1255a(a)(3). In November 1986, the INS sent a telex to all of its offices interpreting the phrase "brief, casual, and innocent absences." The telex specified that an alien who, after November 6, 1986, made any departure and subsequent reentry without prior authorization from the INS would be ineligible for legalization, no matter how brief, casual, or otherwise innocent the absence. The INS immediately began enforcing its interpretation of "brief, casual, and innocent" against aliens who had not obtained "advance parole" from the INS. The telex's interpretation of "brief, casual, and inno-

cent" was later formalized in an INS regulation:

*Brief, casual, and innocent* means a departure authorized by the Service (advance parole) subsequent to May 1, 1987 of not more than thirty days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control.

8 C.F.R. § 245a.1(g) (emphasis in original).

In November 1986, a group of aliens alleging that they were otherwise eligible for naturalization under IRCA filed a class action in federal district court challenging the INS' advance parole policy as inconsistent with IRCA. *Catholic Social Services, Inc. v. Meese ("CSS I")*, 685 F.Supp. 1149 (E.D.Cal.1988). The district court certified a class pursuant to Federal Rule of Civil Procedure 23 consisting of "all persons prima facie eligible for legalization under [IRCA] who departed and reentered the United States without INS authorization (i.e., 'advance parole') after the enactment of IRCA following what they assert to have been a brief, casual and innocent absence from the United States." The district court held that the INS' interpretation of IRCA was "inconsistent with the statutory scheme" and issued remedial orders requiring, among other things, that the INS extend the end of the twelve-month application period under IRCA from May 1988 to November 1988. The government did not appeal the merits of the district court's holding that the INS' interpretation of "brief, casual, and innocent" was inconsistent with IRCA, but it did appeal the remedial orders entered by the district court. We affirmed the district court in consolidated appeals in *Catholic Social Services, Inc. v. Thornburgh ("CSS II")*, 956 F.2d 914 (9th Cir.1992).

On review of our decision, the Supreme Court held that the record did not establish that plaintiffs' suit was ripe. *See Reno v. Catholic Social Services, Inc. ("CSS*

*III* "), 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). The Court remanded for further development of the record. In its opinion, the Court described its understanding, based on the incomplete record, of the means by which the INS implemented the advance parole policy. According to the Court's description, when an applicant for legalization under IRCA went into an INS office, he or she would first encounter a Legalization Assistant to whom the INS had given pre-filing authority over applicants. If the Legalization Assistant determined that the applicant was ineligible for legalization under IRCA because of failure to obtain advance parole from the INS for a "brief, casual, and innocent" absence, the Assistant would tell the applicant that he or she was ineligible to file an application. Because this pre-filing rejection of applicants took place at the front desk of an INS office, the process of pre-filing screening and rejection had come to be known by the informal term "front-desking."

Because the Court could not determine from the record whether the named plaintiffs could allege that they had been turned away at the front desk, it vacated our judgment with directions to remand to the district court for "proceedings to determine which class members were front-desked." *Id.* at 66–67, 113 S.Ct. 2485. It stated that "a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Id.* at 59, 113 S.Ct. 2485. The Court expressed skepticism about the ripeness of claims by those who had not been turned away at the front desk: "Although we think it unlikely, we cannot rule out the possibility that further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a substantial

cause of their failure to apply, so that they can be said to have had the 'advanced parole' . . . regulation applied to them in a sufficiently concrete manner to satisfy ripeness concerns." *Id.* at 66 n. 28, 113 S.Ct. 2485.

We remanded to the district court for further proceedings in light of the Supreme Court's opinion. *Catholic Social Services, Inc. v. Reno ("CSS IV"),* 996 F.2d 221 (9th Cir.1993). On remand, plaintiffs filed a seventh amended complaint. Three named plaintiffs in the amended complaint alleged that an INS officer at the front desk had told them that they were ineligible for legalization under IRCA and had turned them away without an application form. Three other named plaintiffs alleged that they had been discouraged from coming to INS offices by reports of others having been turned away. The district court then certified a class defined as follows:

All persons, otherwise eligible for legalization under IRCA, who, after November 6, 1986, depart or departed the United States for brief, innocent and casual absences without advance parole, and who (i) are therefore deemed ineligible for legalization, or (ii) were informed that they were ineligible to apply for, or were ineligible for legalization, or were refused by the INS or its QDEs[1] legalization forms, and for whom such information, or inability to obtain the required application forms, was a substantial cause of their failure to timely file or complete a written application.

The district court found it had jurisdiction over this class and continued its prior remedial orders in effect. The government appealed.

---

1. Applicants for legalization under IRCA could file an application in an INS office or in the office of a Qualified Designated Entity (QDE). QDEs are state, local, community, or voluntary organizations authorized by the Attorney General to accept applications under certain conditions. 8 U.S.C. § 1255a(c)(2–3). QDEs were specifically authorized by IRCA to receive application forms from aliens under the legalization program. 8 U.S.C. § 1255a(c)(1)(A-B).

In 1996, while the appeal was pending, Congress enacted IIRIRA. Section 377 of IIRIRA limits the courts' jurisdiction over claims brought under IRCA. Its text provides:

> Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person in fact filed an application under this section within the [twelve-month] period specified by subsection (a)(1) of this section, or attempted to file a complete application and application fee with an authorized legalization officer of the [Immigration and Naturalization] Service but had the application and fee refused by that officer.

8 U.S.C. § 1255a(f)(4)(C).

In an unsigned opinion, over the partial dissent of one member, a panel of this court reversed. *Catholic Social Services, Inc. v. Reno ("CSS V")*, 134 F.3d 921 (9th Cir.1998). In a section headed "Applicability of the Statute," it held that § 377 eliminated the jurisdiction of the federal courts to entertain a claim for adjustment of status under IRCA except for claims brought by aliens who actually "tendered or attempted to tender a complete application and fee." *Id.* at 925. According to the panel in *CSS V,* "[i]n order for a legalization officer to have refused a complete application, a complete application must have been tendered. Clearly, someone who was discouraged from filling out an application or whose request for an application was denied would not fall within the purview of § 377." *Id.* at 925–26.

Then, in a section of the opinion headed "Constitutionality of Section 377," the panel upheld the constitutionality of § 377 against a separation of powers challenge based on a contention that Congress had impermissibly intruded on judicial authority by interfering with pending litigation in violation of *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). *CSS V,* 134 F.3d at 926. The panel also rejected a due process challenge based on a contention that Congress had completely foreclosed judicial review of the constitutionality of § 377. *Id.* at 927.

Finally, in the penultimate paragraph of the opinion, at the end of the section headed "Conclusion," the panel wrote that it was precluded from resolving the class members' contention that § 377 violated equal protection. *See id.* at 928.

Based on its construction of § 377, the panel concluded that no named plaintiff had a right to challenge the INS' advance parole policy as inconsistent with IRCA. Rather than remand with leave to amend the complaint in light of § 377, the panel remanded with instructions to dismiss the suit for lack of jurisdiction without leave to amend. On remand, the district court dismissed the case without prejudice.[2]

On April 7, 1998, plaintiffs filed a new class action in the district court. Among the named plaintiffs in the new action were plaintiffs who alleged that they satisfied § 377 by having tendered completed applications and fees and having been turned away. These plaintiffs challenged the advance parole policy as inconsistent with IRCA. Also among the named plaintiffs in the new action were plaintiffs who did not satisfy § 377 but who alleged that they had been turned away at the front desk without having been given applications, and plaintiffs who alleged that they had been discouraged from coming to INS offices by reports of others having been turned away. These plaintiffs challenged § 377 of IIRIRA as inconsistent with the equal protection component of the Due Process Clause of the Fifth Amendment. The district court certified a class of the

---

**2.** A first dismissal without prejudice was filed on March 10, 1998. In considering whether to take the case en banc, the Ninth Circuit withdrew the mandate. At that time, the district court vacated its first dismissal. The Ninth Circuit then issued its mandate after a denial of rehearing en banc. The district court again dismissed the case without prejudice on December 23, 1998.

first group of plaintiffs challenging the advance parole policy, but refused to certify a class of the second group challenging § 377.

The class certified by the district court was defined as follows:

> All persons who timely filed for class membership under [*CSS I*] and were otherwise prima facie eligible for legalization under [IRCA] and were thus granted class membership, and who tendered completed applications for legalization under [IRCA] and fees to an INS officer or agent acting on behalf of the INS, including a QDE, during the period from May 5, 1987 to May 4, 1988, and whose applications were rejected for filing because they had traveled outside the United States after November 6, 1986 without advance parole.

As to this class, the district court found that the statute of limitations had been tolled during the pendency of the earlier class action and that plaintiffs' claims were not time-barred. The court also found that the new class action was not barred by claim preclusion arising out of the earlier action. The court did not analyze issue preclusion.

In determining the scope of injunctive relief for the class, the district court found that plaintiffs had demonstrated a likelihood of success on their claim that the INS' advance parole policy violated IRCA. The district court granted preliminary injunctive relief designed to protect members of the earlier class action who were also members of the class certified in the new class action. It ordered the parties to meet and confer to develop a plan for determining membership in the new class and enjoined the government, pending such a determination, from executing final orders of removal or from revoking or denying work authorizations of any class member in the earlier class action.

Under the panel decision in *CSS V*, those whom a Legalization Assistant had turned away at the front desk without an application, as well as those whom the advance parole policy had discouraged from even coming into an INS office, were prevented by § 377 from challenging the policy as inconsistent with IRCA. The district court noted that these applicants and would-be applicants had a plausible equal protection argument against § 377, but it concluded that the panel in *CSS V* had rejected that argument. The district court therefore found that the equal protection argument had an insufficient likelihood of success to warrant certifying a class and granting preliminary injunctive relief.

The government appealed, and plaintiffs cross-appealed. In a two-to-one decision, the same panel that had decided *CSS V* dismissed the new class action as time-barred. *See Catholic Social Services, Inc. v. INS ("CSS VI"),* 182 F.3d 1053 (9th Cir.1999). We voted to take *CSS VI* en banc.

## II

We must first decide whether this second class action is time-barred. The statute of limitations for actions against the government is six years. *See* 28 U.S.C. § 2401(a). It is undisputed that the earlier class action was timely. The question before us is whether the statute of limitations was tolled during the pendency of that action. If the limitations period was tolled, it is undisputed that the action now before us was also timely filed.

## A

There are two groups of plaintiffs with potentially viable claims in this case. The first group is plaintiffs who satisfy the statutory criteria of § 377. These plaintiffs tendered completed applications and fees to an INS officer at the front desk, and had their applications and fees refused. Those plaintiffs are permitted by § 377 to bring suit for legalization under IRCA. If timely filed, their IRCA claims may properly be considered on the merits.

The second group is plaintiffs who satisfy the constitutional ripeness criteria of *CSS III* but not the statutory criteria of

§ 377. In the words of the Court in *CSS III*, these are plaintiffs who have "[taken] the affirmative steps that [they] could before the INS blocked [their] path by applying the regulation to [them]." 509 U.S. at 59, 113 S.Ct. 2485. These plaintiffs include, at a minimum, those who went to an INS office and told their story to an INS officer at the front desk, were told that they were ineligible to apply, and were turned away without an application. These plaintiffs are barred by § 377 from seeking legalization under IRCA. If timely filed, their constitutional claims against § 377 may be considered on the merits; if § 377 is unconstitutional, their IRCA claims also may be considered on the merits.

Both groups of plaintiffs have at all times vigorously pursued this litigation. A class of which they were members originally filed suit immediately after the INS' promulgation of its advance parole policy. A seventh amended complaint was filed promptly to satisfy the Supreme Court's ripeness holding in *CSS III*. Three of the named plaintiffs in the seventh amended complaint specifically alleged that they went to an INS office, told their story to the INS officer at the front desk, were told they were ineligible to apply, and were turned away without an application.

Only when the district court's decision based on the seventh amended complaint was on appeal to this court did Congress enact § 377 of IIRIRA. Section 377 for the first time restricted those who could seek legalization under IRCA to plaintiffs who had tendered completed applications and fees. Thus, only after the passage of § 377 was the eligible plaintiff class restricted to those who satisfied the criteria of § 377, and only after the passage of § 377 were the three named plaintiffs in the seventh amended complaint disqualified from representing the class of plaintiffs seeking legalization under IRCA. Only after the passage of § 377, in other words, were plaintiffs in the first group, who had tendered completed applications and fees, placed on notice that the complaint needed to be amended once again, this time to include a named plaintiff from the first group. And only after the passage of § 377 were plaintiffs in the second group, who had told their story at the front desk and had been turned away without an application, placed on notice that the complaint needed to be amended once again, this time to allege that § 377 unconstitutionally deprived them of their right to seek legalization under IRCA.

However, rather than remand to the district court to allow amendment of the complaint to deal with the new reality that had been created by the enactment of § 377 while the case was on appeal, the panel of this court in *CSS V* remanded with instructions to dismiss the complaint. We believe that it would have been by far the better course for the panel in *CSS V* to remand with instructions to allow amendment of the complaint to satisfy requirements imposed for the first time while the case was on appeal. If the panel in *CSS V* had allowed such amendment, there would be no tolling and class certification issues. But because the panel ordered the dismissal of the action in *CSS V*, plaintiffs were obliged to file a new action rather than allowed to continue their pending action.

## B

■ The Supreme Court has twice addressed tolling issues arising out of the dismissal of a class action. In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Court allowed unnamed members of a class to intervene as individual plaintiffs in an individual action that continued after denial of class certification. In deciding that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status," *id.* at 553, 94 S.Ct. 756, the Court balanced the purposes behind class actions and statutes of limitations. Class actions promote "efficiency and economy of litigation" by consolidating

numerous individual suits into a single suit. *Id.* Statutes of limitations "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories faded and witnesses disappeared." *Id.* at 554, 94 S.Ct. 756. The Court accommodated both purposes by formulating a "rule ... that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.*

In *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the Court extended *American Pipe* to allow tolling not only where plaintiffs sought to intervene in a continuing action, but also where they sought to file an entirely new action. According to the Court, "[t]he filing of a class action tolls the statute of limitations as to all asserted members of the class ... not just as to interveners." *Id.* at 350, 103 S.Ct. 2392 (internal quotations omitted). Again, the Court relied upon the dual purposes of class actions and statutes of limitations. In order both to avoid "needless multiplicity of actions" and "to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights," *id.* at 351–52, 103 S.Ct. 2392, tolling was appropriate. "[T]olling the statute of limitations ... creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification." *Id.* at 353, 103 S.Ct. 2392. "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or intervene as plaintiffs in the pending action." *Id.* at 354, 103 S.Ct. 2392.

There is no dispute that if members of the class in *CSS V* had filed individual actions after the dismissal of their class action, the statute of limitations would have been tolled for those individual actions. All members of the en banc panel agree on this point. The only question in this case is whether those same plaintiffs should be permitted to aggregate their individual actions into a class action. Strictly speaking, this is not a statute of limitations question at all. It is, rather, a question of whether plaintiffs whose individual actions are not barred may be permitted to use a class action to litigate those actions. Neither *American Pipe* nor *Crown, Cork & Seal* speaks directly to this question, for later-filed individual actions, rather than class actions, were at issue in both of these cases.

If class action certification had been denied in *CSS V,* and if plaintiffs in this action were seeking to relitigate the correctness of that denial, we would not permit plaintiffs to bring a class action. In *Robbin v. Fluor Corp.,* 835 F.2d 213 (9th Cir.1987), we interpreted *American Pipe* not to allow tolling when the district court in the previous action had denied class certification, and when the second action sought to relitigate the issue of class certification and thereby to circumvent the earlier denial. *Id.* at 214. The Second Circuit came to the same conclusion in *Korwek v. Hunt,* 827 F.2d 874 (2nd Cir. 1987). Other circuits agree with *Robbin* and *Korwek,* holding that the filing of an earlier class action does not toll the statute of limitations when the second action is no more than an attempt to relitigate the correctness of the earlier class certification decision. *See, e.g., Basch v. Ground Round, Inc.* 139 F.3d 6, 11 (1st Cir.1998).

Some circuits have extended the *Robbin* and *Korwek* rule prohibiting relitigation, applying it to cases in which a later class of plaintiffs does not disagree with the denial of class certification, but rather tries to cure the deficiency that led to the denial. These circuits say that plaintiffs "may not piggyback one class action onto another and thus toll the statute of limitations indefinitely." *Griffin v. Singletary,* 17 F.3d 356, 359 (11th Cir.1994) (internal quo-

tation marks omitted); *see Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1351 (5th Cir.1985) ("[P]utative class members may [not] piggyback one class action onto another[.]"); *see also Andrews v. Orr,* 851 F.2d 146 (6th Cir. 1988); *Fleck v. Cablevision VII, Inc.,* 807 F.Supp. 824 (D.D.C.1992); *Smith v. Flagship Int'l,* 609 F.Supp. 58 (N.D.Tex.1985); *Burns v. Ersek,* 591 F.Supp. 837 (D.Minn. 1984).

In *Griffin v. Singletary,* three individual named plaintiffs brought a would-be class action under Title VII based in part on the defendant-employer's use of a qualifying test. The district court initially relied on Fifth Circuit precedent to certify the class as an "across-the-board" class action that did not require that the individual named plaintiff suffer the injuries of unnamed class members. After the Supreme Court, in a separate case, disapproved "across-the-board" class actions and reiterated its prior holdings that a class representative must suffer the same injuries as unnamed class members, the district court decertified the class. *See General Telephone of the Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("We have repeatedly held that 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" (internal quotations and citations omitted)). The district court held that the would-be class failed to satisfy Rule 23(a)(4) because the first two individual named plaintiffs had not been injured by the test, and the third had not filed a timely charge with the Equal Employment Opportunity Commission. After dismissal of this action, a second would-be class action was brought by individual named plaintiffs who had filed timely claims and who claimed to have been injured by the test. The court held that the denial of class certification in the first action precluded a second class action:

> The plaintiffs may not "piggyback one class action onto another," *Salazar–Calderon* ..., and thereby engage in endless rounds of litigation ... over the adequacy of successive named plaintiffs

to serve as class representatives.... [W]e decline to adopt any rule that has the potential for prolonging litigation about class representation any further.

*Griffin,* 17 F.3d at 359.

In *Salazar–Calderon v. Presidio Valley Farmers,* the district court denied certification in three would-be class actions. After class certification in the first action was denied for failure to satisfy the predominance and superiority criteria of Rule 23(b)(3), the second and third actions were filed. Class certification was denied in those actions on the same ground as the first. Individual named plaintiffs then filed a fourth action. The court allowed tolling for the individual actions during the pendency of the first class action, but not the second and third. It wrote:

> Plaintiffs [in the fourth action] ... argue ... that ... *Crown*'s tolling principle applies ... not only for the first class certification petition filed but also for any subsequent petitions involving the same class. We are not persuaded. Plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any.

765 F.2d at 1351.

This case is unlike either *Griffin* or *Salazar–Calderon.* In both of those cases, the would-be classes in the first actions failed to satisfy criteria of Rule 23. In *Griffin,* the first class action was decertified because the individual named plaintiffs were not proper class representatives under Rule 23(a)(4), and the court refused to allow a later-filed class action that sought to cure the procedural deficiencies of the first. In *Salazar–Calderon,* the first three actions were never certified because of failure to satisfy the criteria of Rule 23(b)(3). The court in the fourth action allowed tolling for individual named plaintiffs during the pendency of the first would-be class action, but not during the pendency of the two later-filed class ac-

tions that had sought to cure the procedural deficiencies of the first.[3]

Unlike *Griffin* and *Salazar–Calderon,* there is no dispute in this case that the classes in the first action were properly certified. Here, there were two successive classes in the first action. The first class was certified by the district court in *CSS I;* the second was certified by the district court in *CSS IV.* The class in *CSS I* was narrowed when the Supreme Court in *CSS III* found the substantive claim not ripe for plaintiffs who had not "[t]aken the affirmative steps that [they] could before the INS blocked [their] path by applying the regulation to [them.]" 509 U.S. at 59, 113 S.Ct. 2485. The class in *CSS IV* was narrowed on appeal when § 377 of IIRIRA restricted the definition of those entitled to challenge the "advance parole" policy. There is no claim that the classes in *CSS I* and *CSS IV* were improperly certified, and the classes were narrowed on both occasions for reasons unrelated to Rule 23 certification. Plaintiffs in the class action now before us thus do not seek to cure any procedural deficiencies in the classes under Rule 23 certified in the first action because there were none.

Plaintiffs in this case are thus in a fundamentally different posture from plaintiffs in cases in which subsequent class actions were not allowed. They have at all times vigorously pursued this litigation. They originally filed suit immediately after the INS' promulgation of its advance parole policy, and they amended their complaint promptly to satisfy the Supreme Court's ripeness holding in *CSS III.* Doubtless, they would also have amended their complaint promptly to satisfy § 377 if the panel in *CSS V* had given them an opportunity to do so. As it was, they promptly brought a new action, filing a complaint challenging the advance parole policy as a violation of IRCA and challenging the newly passed § 377 as a violation of equal protection.

We hold that under the doctrine of *American Pipe* and *Crown, Cork & Seal* the statute of limitations was tolled during the pendency of the first class action for the class members and would-be class members in the action now before us, and that plaintiffs in this case may aggregate their individual actions into a class action. Plaintiffs in this case are not attempting to relitigate an earlier denial of class certification, or to correct a procedural deficiency in an earlier would-be class. Both the class members challenging the advance parole policy as inconsistent with IRCA and the would-be class members challenging § 377 as inconsistent with equal protection were members of the classes certified in the earlier action. The substantive claims asserted in this action are thus within the scope of those asserted in the earlier action, and the dismissal of that action did not result from an adverse decision on the merits of any of those claims.

### III

Because this class action is not time-barred, we reach the question whether the district court acted appropriately in granting and denying preliminary injunctive relief.

### A

We first address whether § 306(a) of IIRIRA, 8 U.S.C. § 1252(f)(1), deprives the district court of jurisdiction to issue the preliminary injunction. Section 306(a) provides:

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provi-

**3.** Two district courts have allowed tolling during the pendency of a first class action for the benefit of a second class action, specifically noting that the second action did not seek to relitigate an earlier certification denial or to cure an earlier procedural deficiency. *See Shields v. Smith,* 1992 WL 295179 (N.D.Cal.); *Schur v. Friedman & Shaftan,* 123 F.R.D. 611 (N.D.Cal.1988).

sions of part IV of this subchapter, as amended by [IIRIRA], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

■ This provision specifically limits the lower federal courts' "jurisdiction and authority to enjoin or restrain the operation of the provision of part IV of this subchapter." Part IV, "Inspection, Apprehension, Examination, Exclusion, and Removal," includes 8 U.S.C. §§ 1221–1231. However, the district court in this case issued the preliminary injunction under 8 U.S.C. § 1255a, located in part V, "Adjustment and Change of Status." Therefore, by its terms, the limitation on injunctive relief does not apply to the preliminary injunction granted by the district court.

We recognize that there are limitations on judicial review contained in Part V, but we conclude that they do not apply in this case. The Supreme Court addressed one aspect of this limited review in *CSS III*, deciding that the exclusive judicial review of a "determination respecting an adjustment of status" under 8 U.S.C. § 1255a(f)(1) did not apply to cases like *CSS III* in which no application had been accepted, and thus there was no "determination" by the INS to review. 509 U.S. at 56, 113 S.Ct. 2485. The other limitation on judicial review is § 377 of IIRIRA, codified at 8 U.S.C. § 1255a(f)(4), discussed at length in *CSS V* and in this opinion. For present purposes, it suffices to say that § 377 purports to limit those who may challenge the legality of the advance parole policy under IRCA, but it does not limit the jurisdiction of the district court to grant appropriate injunctive relief.

■ We next address whether § 242(g) of the Immigration and Nationality Act, as amended by 1IRIRA, 8 U.S.C. § 1252(g), limits the district court's jurisdiction to grant injunctive relief. Section 242(g) provides:

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

As interpreted by the Supreme Court in *Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482–83, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), this provision applies only to the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings. Consistent with the Court's decision in *American–Arab Anti–Discrimination Committee*, we have affirmed grants of injunctive relief to classes of aliens challenging deportation procedures in two recent cases. In *Walters v. Reno*, 145 F.3d 1032 (9th Cir.1998), we upheld the district court's grant of class-wide injunctive relief and specifically declined to apply the limitation on jurisdiction in § 1252(g) to the district court's exercise of jurisdiction over due process challenges brought by a class of aliens directly against deportation procedures. *See id.* at 1051–53. In *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999), we again affirmed the exercise of jurisdiction and the grant of a stay of deportation to a class of aliens in order to allow them to pursue their challenges to regulations promulgated by the INS.

We therefore conclude that neither § 1252(f)(1) nor § 1252(g) limits the district court's jurisdiction to grant injunctive relief in this case.

### B

Finally, we address the merits of the appeals. The government contends that the district court erred in granting any preliminary injunctive relief. Plaintiffs cross-appeal, contending that the court erred in not granting additional relief. We affirm the district court's grant of the existing injunction, but we reverse the district court's denial of additional injunctive relief.

1

■ The district court certified a class defined as all members of the class certified in the earlier action who met the requirements of § 377, and it granted preliminary injunctive relief to that class. That is, the district court granted relief to the class of those who had actually tendered completed applications and the appropriate fee to the INS legalization officer or QDE,[4] and whose applications and fees had been rejected. These class members contend, as did the class members in the earlier action, that the INS' advance parole policy is inconsistent with IRCA.

We affirm the district court's grant of preliminary injunctive relief to this class. The merits of their case were decided in their favor in the earlier litigation, both by the district court in *CSS I* and by this court in *CSS II.* The Supreme Court did not reach the merits of *CSS II* in *CSS III,* but rather vacated the decision on ripeness grounds. The class has thus clearly demonstrated a likelihood of success on the merits. It is equally clear that the class would suffer immediate and severe hardship if its members were deported or denied work authorization pending final determination of their suits. Accordingly, we hold that the district court acted within its discretion in issuing an order protecting, on an interim basis, the entire class certified in the earlier litigation until such time as the subset that comprises the currently certified class can be identified and protected. In affirming this aspect of the district court's order, we note its short-term nature. The district court ordered the parties to meet and confer within fifteen days of the date of entry of the order to develop a plan to determine which members of the earlier class are members of the current class. That the preliminary injunction protecting the entire earlier class is still in force is not a result of overreaching in the district court's order, but rather of the fact that the government chose to appeal rather than comply. Finally, we find no abuse of discretion in the district court's continuation of the bond previously posted by plaintiffs.

2

The district court declined to grant preliminary injunctive relief to the would-be class of plaintiffs who challenge § 377 as a violation of the equal protection component of the Due Process Clause of the Fifth Amendment and who, if § 377 were held unconstitutional, also would challenge the advance parole policy as a violation of IRCA. The district court declined to certify a class and grant relief because, based on the panel decision in *CSS V,* it believed that there was insufficient likelihood of success. In so doing, however, the district court made clear that it would have granted interim relief if it had not felt constrained by *CSS V,* stating, "[i]f free to do so, this court would find that there are fair grounds to litigate and that the balance of hardships tips decisively in plaintiffs' favor."

If the panel in *CSS V* had actually decided the equal protection challenge to § 377, we would agree with the district court. Indeed, we would go farther, not merely holding that there is insufficient likelihood of success, but holding that the doctrine of issue preclusion makes success flatly impossible. *Montana v. United States,* 440 U.S. 147, 152, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Hernandez v. City of Los Angeles,* 624 F.2d 935, 937 (9th Cir.1980). But if the equal protection claim was not actually decided by the *CSS V* panel and issue preclusion therefore does not apply, the

---

4. We agree with the *CSS V* panel's conclusion that the requirement in § 377 of presentation of a completed application and fee to a legalization officer "should be broadly construed to mean presentation to anyone authorized by the INS and IRCA to receive such form." *CSS V,* 134 F.3d at 924 n. 2. Since QDEs were specifically authorized by the INS and IRCA to receive application forms, *see* 8 U.S.C. § 1255a(c), aliens who filed or attempted to file a completed application and fee with a QDE fall within the statutory grant of jurisdiction and are properly included in this class.

district court is free to decide that claim as it believes the law requires.

■ Issue preclusion is appropriate where a court has actually and necessarily decided an issue in earlier litigation between the same parties. *Montana,* 440 U.S. at 152, 99 S.Ct. 970; *Hernandez,* 624 F.2d at·937. However, when a decision in prior litigation is unclear, that decision does not preclude subsequent litigation on that issue. *Board of Ed. of Oklahoma City Pub. Schools v. Dowell,* 498 U.S. 237, 245–46, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (finding earlier decision too unclear to preclude relitigation); *Connors v. Tanoma Mining Co., Inc.,* 953 F.2d 682, 684 (D.C.Cir.1992) ("If the basis of the ... decision is unclear, and it is uncertain whether the issue was actually and necessarily decided in that litigation, then relitigation of the issue is not precluded."); *Garrett v. City and County of San Francisco,* 818 F.2d 1515, 1520 (9th Cir.1987).

It is clear that the panel in *CSS V* actually and necessarily decided the meaning of § 377 in the section of its opinion headed "Applicability of the Statute," where it construed § 377 to limit the group of plaintiffs who can challenge the INS' advance parole policy to those aliens who actually tendered or attempted to tender completed applications and fees to the INS, and whose applications and fees were rejected. 134 F.3d at 924–26. It is also clear that the *CSS V* panel actually and necessarily decided separation of powers and due process challenges to § 377. Both challenges were separately analyzed and rejected in the section headed "Constitutionality of Section 377." *Id.* at 926–27.

It is also clear that the panel in *CSS V* did not actually and necessarily decide plaintiffs' equal protection challenge to § 377. The panel does not discuss the equal protection issue either in the section of its opinion analyzing the statute or in the section analyzing the statute's·constitutionality. The panel's only discussion of

equal protection is contained in the penultimate paragraph of the opinion. That paragraph reads, in its entirety:

> The enactment of § 377 also precludes this court from considering the class members' argument that § 377 violates the Equal Protection Clause of the Fifth Amendment [sic].[5] The class members before this court have not alleged facts sufficient to satisfy § 377's requirement that they were actually front-desked nor have they alleged facts sufficient to demonstrate that they were discouraged from filing an application by the front-desking policy. By enacting § 377, Congress explicitly denied the federal courts the power to review a constitutional challenge by persons who did not qualify for benefits because they had failed to present a complete application to a legalization officer within the statutory time limits.

*Id.* at 928.

■ However, it is not clear that the *CSS V* panel actually and necessarily decided that § 377 barred plaintiffs from bringing an equal protection challenge to § 377. The panel appears to state that § 377 precluded plaintiffs from bringing such a challenge, but it is not clear that the panel intended such a statement. To state that § 377 precluded an equal protection challenge to itself is to state a legal impossibility, for a statute cannot treat one group less favorably than another and, at the same time, insulate itself from constitutional attack by statutorily forbidding the disfavored group from bringing an equal protection challenge to that very statute. Not only does the apparent statement make no sense. The panel also would not have construed § 377 in the penultimate paragraph of its opinion, for the panel had already analyzed and construed § 377 at length in the section of the opinion headed "Applicability of the Statute." Thus, we do not believe that in this paragraph the panel "actually and neces-

---

**5.** The Fifth Amendment has no Equal Protection Clause. An equal protection claim under the Fifth Amendment is brought under the equal protection component of the Due Process Clause. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

sarily" decided, within the meaning of issue preclusion doctrine, that § 377 precluded plaintiffs from bringing an equal protection challenge to itself.

Although the equal protection challenge to § 377 is an open issue in this litigation, we believe it would be inappropriate for us to decide the question with the case in its current posture. Because § 377 was passed after the earlier class action had been appealed from the district court, and because in this class action the district court thought itself constrained by *CSS V,* the district court has never addressed the equal protection issue. Under the circumstances, we think it best for the district court to address the equal protection challenge to § 377 as an initial matter, and to grant or deny injunctive relief as appropriate, subject to appellate review by this court.

### IV

For the foregoing reasons, we hold (1) that the district court did not err in holding that for those plaintiffs who satisfied § 377 the statute of limitations in this action was tolled during the pendency of the earlier class action that was terminated by the panel decision in *CSS V,* and that those plaintiffs may proceed with a class action in this case; (2) that the district court did not err in granting the preliminary injunction now in force; and (3) that the district court erred in believing itself foreclosed from considering the equal protection challenge to § 377 of those plaintiffs who failed to satisfy the criteria of § 377, and in accordingly denying class action certification to those plaintiffs and limiting the relief they sought.

AFFIRMED in part; REVERSED in part; and REMANDED for further proceedings consistent with this opinion.

KOZINSKI, Circuit Judge, with whom Judges TROTT, FERNANDEZ, and T.G. NELSON join, dissenting:

### I

The majority raises a conflict with the law of every circuit that has decided a question of national significance. The question is whether filing a class action tolls the statute of limitations for purposes of filing a subsequent class action. We know that a class action tolls limitations for purposes of filing *individual* claims. *See Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). The Supreme Court's rationale for this result is elegant and appealing: While the class action is pending, putative class members are entitled to rely on it to preserve their rights. If the rule were otherwise, as the limitations period drew to a close, class members would feel compelled to protect themselves by filing individual lawsuits, even though the class action was still pending. This would undermine the policy of class litigation, which favors filing a single lawsuit rather than many.

To avoid this perverse result, *Crown, Cork* adopted a simple solution: If the class action failed before reaching the merits, putative class members would be allowed to bring individual lawsuits for however long was left on the statute of limitations clock at the time the class action was filed. While the Supreme Court said nothing about filing successive class actions, it strongly implied that filing a subsequent class action is not an option for class members once a class is dismissed: "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Id.* at 354, 103 S.Ct. 2392. Given that *Crown, Cork* was a case dealing with class actions, it is significant that the Court did not mention the possibility of filing a second class action should the first one fail.

Every circuit to have considered the issue (including our own) has held that the rationale of *Crown, Cork* does not permit the filing of a second or subsequent class action once the original statute of limita-

tions has run. This reluctance is based on a concern about the replicative effects of the *Crown, Cork* rationale: A subsequent class action does not merely preserve the rights of class members, it also engages for a second (or third or further) time the rationale of *Crown, Cork*. Thus, if the second class action is also dismissed short of the merits, class members could still file individual lawsuits or another class action. This would stretch the statute of limitations for years, perhaps decades, past its original expiration date.

Our case illustrates the point. The six-year statute of limitations began to run no later than May 4, 1988; but for tolling, it would have expired May 4, 1994. The first application of *Crown, Cork* extended the limitations period to June 26, 2004–a full decade after the expiration of the original limitations period. By giving *Crown, Cork* a second iteration, the majority has extended the period to at least 2006, probably much farther. Should the second class action fail without reaching the merits, individual plaintiffs would still have six years from the day *that* decision becomes final to sue individually or file another class action-extending the statute of limitations beyond the wildest dreams of those who enacted it.[1]

Every other circuit opinion to have addressed the issue has recognized, as the majority apparently does not, that successive applications of *Crown, Cork* can severely undermine the statute of limitations. *See Basch v. Ground Round, Inc.,* 139 F.3d 6, 11 (1st Cir.1998) ("Permitting such tactics would allow lawyers to file successive putative class actions with the hope of attracting more potential plaintiffs

and perpetually tolling the statute of limitations. . . . This simply cannot be what the *American Pipe* rule was intended to allow. . . ."); *Griffin v. Singletary,* 17 F.3d 356, 359 (11th Cir.1994) ("The plaintiffs may not 'piggyback one class action onto another' and thereby engage in endless rounds of litigation. . . . [W]e decline to adopt *any rule* that has the potential for prolonging litigation about class representation even further." (citation omitted and emphasis added)); *Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir.1987) ("[T]o extend tolling to class actions . . . 'falls beyond [*American Pipe*'s] carefully crafted parameters into the range of abusive options.'" (citation omitted)); *Andrews v. Orr,* 851 F.2d 146, 149 (6th Cir.1988) ("These decisions reflect the concern . . . [that] '[t]he tolling rule of *American Pipe* . . . is a generous one, inviting abuse.'" (citation omitted)); *Korwek v. Hunt,* 827 F.2d 874, 879 (2nd Cir.1987) (tolling subsequent class actions "would be inimical to the purposes behind statutes of limitations and the class action procedure"); *Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1351 (5th Cir.1985) ("Plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any.").[2]

*Crown, Cork* recognized that the plaintiffs' interests must be balanced against those of the defendants, which includes an interest in repose. Tolling the limitations period a second, third or fourth time, dramatically shifts the balance of equities in favor of the plaintiffs-and against the de-

---

1. Plaintiffs would still have the full six years left to sue because they have not yet used a single day of the limitations period. CSS first sued in November 1986, when the INS announced it was going to enact the challenged regulation. The amnesty statute did not go into effect until May 1987, six months later. *See* 8 CFR § 245a.2(a)(1) (2000). Before the final mandate for the first suit was issued in June 1998, CSS had already made a preemptive strike, having filed its second class action two months earlier (in April 1998).

2. The great majority of district courts have come to the same conclusion. *See In re Westinghouse Securities Litigation,* 982 F.Supp. 1031, 1033–34 (W.D.Pa.1997); *In re Cypress Semiconductor Securities Litigation,* 864 F.Supp. 957, 959 (N.D.Cal.1994); *Fleck v. Cablevision VII, Inc.,* 807 F.Supp. 824, 826–27 (D.D.C.1992); *Smith v. Flagship Int'l,* 609 F.Supp. 58, 63–64 (N.D.Tex.1985); *Burns v. Ersek,* 591 F.Supp. 837, 842 (D.Minn.1984).

fendants-with respect to the period of repose. Every other circuit has concluded that, if the time limit has been tolled once, defendants' interest in repose must prevail thereafter. Rather than articulating an argument to the contrary, the majority makes a convoluted but unsuccessful effort at distinguishing the other cases.

The majority first tries to distinguish *Robbin* and *Korwek* based on the fact that plaintiffs in our case are not attempting to "relitigate the correctness" of the panel's dismissal in *CSS V* by bringing the same proposed class to a different court. *Maj. Op.* at 1147. Even assuming this is true, *but see infra* at 1157–59 (Graber, J., dissenting in part), the majority does not explain why this distinction could possibly make a difference. If *Robbin* and *Korwek* had been concerned that plaintiffs were relitigating issues previously decided, they could have resolved the case on collateral estoppel grounds. Instead, they dismissed out of concern for the iterative effects of the *Crown, Cork* rationale. *See Robbin,* 835 F.2d at 214; *Korwek,* 827 F.2d at 878. The distinction on which the majority relies has no relevance to the reasoning actually employed by the *Robbin* and *Korwek* courts.

The majority recognizes, as it must, that this distinction does not apply to *Griffin* and *Salazar–Calderon* because those cases clearly did involve different class actions than those filed in the previous suits. The majority then invents a second distinction, namely that plaintiffs in our case are not "try[ing] to cure the deficiency that led to the denial" of class certification. *Maj. Op.* at 1147. This is not even a distinction, because the plaintiffs here *are* trying to fix the problem that led the earlier panel to reject its class and then dismiss its lawsuit. The panel in *CSS V* dismissed the class action because not a single one of the 45,000 members had alleged that he completed an application and tried to file it. *See Catholic Soc. Servs., Inc. v. Reno* ("*CSS V*"), 134 F.3d 921, 927 (9th Cir. 1998). In the absence of such an allegation, the *CSS V* panel held that section 377 divested it of jurisdiction over the claims of the class. The sole purpose of this second lawsuit is to correct that deficiency by adding new plaintiffs, some of whom allege that they tried to file a completed asylum application. Just like plaintiffs in *Griffin* and *Salazar–Calderon,* CSS is trying to refashion a new class action in an attempt to cure the deficiency that caused the earlier dismissal.

But, even assuming this were a real distinction, the majority again fails to explain why it matters. Whether the *Crown, Cork* rationale can be employed more than once does not turn on whether plaintiffs were somehow at fault when the earlier panel dismissed the class action. Instead, as the other circuits have recognized, it is a matter of balancing the interests of plaintiffs in litigating the case by way of class action against the interests of defendants in the period of repose. The majority's nit-picky distinctions do not change the fact that we set ourselves in opposition to all the other circuits in saying that the statute of limitations can be tolled more than once. Worse still, the majority's fact-specific rationale offers no guidance as to when (if ever) we will follow the other circuits and how much (if anything) is left of our *Robbin* opinion. Instead of performing the normal en banc function of clarifying the law, the majority leaves it in total disarray.

## II

The majority also errs in its treatment of the cross-appeal. *See* Maj. Op. 1151–53. It concedes that, "[i]f the panel in *CSS V* had actually decided the equal protection challenge to § 377, . . . the doctrine of issue preclusion [would make] success flatly impossible." Maj. Op. at 1151. The equal protection question remains open, the majority opinion says, because the earlier case did not reach it. *Id.*

So what? The earlier panel *did* reach an issue that is just as lethal to the plaintiffs' equal protection claim, namely standing. The panel did not address the merits of the claim because plaintiffs lacked

standing to raise it, *see CSS V*, 134 F.3d at 928, and the plaintiffs are now bound by that determination. The equal protection claim may be open for us to decide but there is no one with standing to raise it.

Consider an analogy. If a court dismisses a breach of contract suit on statute of limitations grounds, the plaintiffs cannot then bring a new lawsuit seeking to have the contract claim resolved on the merits. The previous case would bar them from relitigating the limitations issue, and it would make no difference that the breach of contract claim was still open.

We can argue all day whether *CSS V* was correctly decided or whether it qualifies as "a legal impossibility." Maj. Op. at 1152. None of it matters. We declined to rehear the case en banc, the plaintiffs did not file a petition for certiorari and the mandate issued. They are bound by that decision and so are we.

FERNANDEZ, Circuit Judge, with whom KOZINSKI and TROTT, Circuit Judges, join dissenting:

I respectfully dissent for the reasons cogently set forth in the majority opinion in *Catholic Social Services, Inc. v. INS*, 182 F.3d 1053 (9th Cir.1999), which I now adopt.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's holding that Plaintiffs who are "constructive front-deskers" may bring an equal protection challenge. That claim did not arise until 1996, when Congress enacted § 377. *See Sisseton–Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 594 (9th Cir.1990) (holding that a constitutional challenge to a federal statute accrued when the statute was enacted); 28 U.S.C. § 2401 (providing a six-year statute of limitation for actions against the United States). I respectfully dissent, however, from the remainder of the opinion, because I believe that the other claims are time-barred.

## BACKGROUND

### 1. General Background

The basic issue in all the *Catholic Social Services (CSS )* cases is whether certain Immigration and Naturalization Service (INS) regulations are valid. Those regulations—the "advance parole" regulations—state that aliens who once left the United States without prior INS approval, even for the briefest periods, are ineligible for amnesty under the Immigration Reform and Control Act of 1986. 8 C.F.R. § 2245a.1(g).

There are three possible kinds of plaintiffs. "Front-deskers" are those aliens who tendered an application for amnesty to the INS, but had the application immediately rejected at the "front desk" based on the advance parole regulations. "Non-filers" are most of those aliens who never applied for amnesty. "Constructive front-deskers" are those non-filers who can demonstrate that the INS' front-desking policy was a substantial cause of their failure to apply. In *CSS III*, the Supreme Court held that non-filers could not challenge the advance parole regulations because the regulations never had been applied to them, but also held that front-deskers could. *CSS III*, 509 U.S. 43, 58–59 & n. 20, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). The Court left open the question whether constructive front-deskers could challenge the regulations. *Id.* at 66 & n. 28, 113 S.Ct. 2485.

### 2. CSS V

On remand from the Supreme Court, "the district court modified the class definition so as to include persons who had actually been front-desked and those who came within the Court's dicta [concerning constructive front-deskers] by being otherwise adversely affected by the front-desking policy." *CSS V*, 134 F.3d 921, 924 (9th Cir.1998). The district court granted class-wide injunctive relief from the advance parole regulations.

While the government's appeal from the district court's order was pending, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Section 377 of IIRIRA provides in part:

> Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person in fact filed an application under this section ... or attempted to file a complete application and application fee with an authorized legalization officer....

In other words, under the statute, only individuals who *either* actually filed applications *or* were front-desked can challenge the advance parole regulations. Constructive front-deskers are excluded.

This court in *CSS V* concluded that, due to § 377, the court lacked jurisdiction over the class that was certified by the district court because "none of the class members or named plaintiffs have alleged that they actually tendered an application and fee or attempted to do so but were rebuffed." *CSS V,* 134 F.3d at 927. That statement seems incorrect because the class that had been certified by the district court clearly included front-deskers. (See the definition quoted at 1156–57, above.) Thus, at first blush, it is difficult to understand how *CSS V* could have held that no class member, as distinct from no named plaintiff, had alleged that he or she attempted to tender an application but was rebuffed.

*CSS V* further held that no member of the class that was before the court could challenge § 377 as violative of equal protection: "The class members before this court have not alleged facts sufficient to satisfy § 377's requirement that they were actually front-desked nor have they alleged facts sufficient to demonstrate that they were discouraged from filing an application by the front-desking policy." *Id.* at 928.

3. *The Present Case*

After the dismissal of *CSS V,* a new group of named plaintiffs filed this action. None of the named plaintiffs in the present case was a named plaintiff in *CSS V,* although *all* the named plaintiffs (as well as all the class members) in this case were members of the *class* in *CSS V.* The named plaintiffs in this case consist of some front-deskers and some constructive front-deskers. The class in this case is smaller than, but is encompassed within, the class in *CSS V.*

The front-deskers argue that the advance parole regulations conflict with the governing statute. The constructive front-deskers similarly argue that the regulations are invalid but, under § 377, the court lacks jurisdiction to hear their claim. Accordingly, they also argue that § 377 violates equal protection by discriminating irrationally between regular front-deskers, whose claims can be heard, and constructive front-deskers, whose claims cannot be heard.

## TOLLING OF THE STATUTE OF LIMITATIONS

The majority opinion distinguishes *Robbin v. Fluor Corp.,* 835 F.2d 213 (9th Cir. 1987), *Korwek v. Hunt,* 827 F.2d 874 (2d Cir.1987), and all the other cases that have held that class actions may not be "stacked" for purposes of tolling, on the ground that Plaintiffs do not seek to relitigate the issue of class certification. Maj. op. at 1147–48. I disagree with that characterization of this case. In my view, Plaintiffs *are* seeking to relitigate the propriety of their proposed class. That is, even if the majority's distinction were theoretically valid, it has no application here.

In *CSS V,* the court held that none of the *named plaintiffs* had alleged that he or she had been front-desked. 134 F.3d at 927. In the absence of such an allegation, the court lacked jurisdiction over the claims of the named plaintiffs due to § 377 and, thus, lacked jurisdiction over the

claims of the entire class. As a result, the court vacated the order of the district court that had certified the class, *CSS V*, 134 F.3d at 928, which is the equivalent of a denial of class certification. It cannot be disputed that, if one of the named plaintiffs in *CSS V* had alleged that he or she had been front-desked, the case would not have been dismissed under § 377. Thus, *CSS V* logically must be seen as resting on an implicit conclusion that the named plaintiffs were not adequate representatives of the class that had been certified by the district court. (The class as certified included front-deskers, but no named plaintiff actually was a front-desker.)

Consistent with that view of *CSS V*, the instant case is simply an attempt by Plaintiffs to relitigate the validity of their class based on their inclusion of new named plaintiffs in the complaint, some of whom do allege front-desking. In other words, the case amounts to nothing more than another attempt to plead a successful class action involving the same group of class members and the same basic claims. So viewed, the case is indistinguishable from all the other no-second-bite-at-the-apple cases, and the statute of limitations should not be tolled.

In addition, as noted above, the *CSS V* court confusingly held that no *member* of the class had alleged that he or she was front-desked, despite the fact that the district court certified a class that included front-deskers. Even if no *named plaintiff* alleged front-desking, it is unclear how the *CSS V* court reached the conclusion that no *class member* had been front-desked. Nonetheless, the court did reach that conclusion. The *CSS V* court's holding is best understood as a holding that the class certified by the district court was improper. In particular, the court seems to have held that, although the district court certi-

fied a class including front-deskers, there were no factual allegations in the complaint sufficient to support the certification.

Once again, that view suggests that Plaintiffs simply are trying to relitigate the issue of the validity of the class. After all, the members of the putative class in this case *all* were members of the class that was dismissed in *CSS V*. Had they more fully alleged their claims in the complaint at issue in *CSS V* (as they now have done), the court would have had jurisdiction over those claims in the earlier iteration of the case and the class would have been valid.

In sum, these plaintiffs are no different from the plaintiffs in all the other cases [1] who were trying to relitigate, in some way, the adequacy of an earlier, rejected class. As *CSS V* explained, the instant plaintiffs had ample time to respond to *CSS III* by amending their complaint to include *named plaintiffs* who actually had been front-desked plus *factual allegations* supporting the existence of a class of front-deskers. *CSS V*, 134 F.3d at 927–28. *CSS V* held that they had failed to do so, and Plaintiffs unfortunately are stuck with that holding, whether right or wrong. Having so failed, Plaintiffs cannot take advantage of the *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), tolling rule in order to make timely their belated effort to relitigate the issue of the validity of the class by filing a new complaint that contains fuller factual allegations and names more adequate class representatives.

It is useful to remember that § 377 did not work a dramatic change in the law. The Supreme Court already had held that front-deskers had ripe claims but non-filers did not. The only change wrought by

1. *Basch v. Ground Round, Inc.*, 139 F.3d 6 (1st Cir.1998); *Griffin v. Singletary*, 17 F.3d 356 (11th Cir.1994); *Andrews v. Orr*, 851 F.2d 146 (6th Cir.1988); *Salazar–Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir.1985); *In re Westinghouse Securities Litigation*, 982 F.Supp. 1031 (W.D.Pa.1997); *In*

*re Cypress Semiconductor Sec. Litig.*, 864 F.Supp. 957 (N.D.Cal.1994); *Fleck v. Cablevision VII, Inc.*, 807 F.Supp. 824 (D.D.C.1992); *Smith v. Flagship Int'l*, 609 F.Supp. 58 (N.D.Tex.1985); *Burns v. Ersek*, 591 F.Supp. 837 (D.Minn.1984).

§ 377 was to eliminate the possibility, skeptically noted by the Supreme Court in *CSS III*, that constructive front-deskers would have ripe claims. Thus, § 377 should not have caught the plaintiffs by surprise—it was hardly certain that a complaint alleging a class *only* of constructive front-deskers (which is what *CSS V* held that the plaintiffs had filed) would survive. It is unfortunate that the *CSS V* plaintiffs failed to name at least some front-deskers as class representatives in the wake of *CSS III*, but that omission is not of this court's making.

For the foregoing reasons, I concur in part and dissent in part.